1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10

11   RAFAEL JASSO,                    )    Civil No. 08-0548-JAH(WVG)
                                      )
12                   Petitioner,      )    REPORT AND RECOMMENDATION
                                      )    DENYING PETITION FOR WRIT OF
13   v.                               )    HABEAS CORPUS
                                      )
14   ROBERT T. HERNANDEZ, Warden,     )
                                      )
15                   Respondent.      )
                                      )
16   _____ )

17

18        Petitioner Rafael Jasso (hereafter "Petitioner"), a state

19   prisoner proceeding with counsel, has filed a Second Amended

20   Petition for Writ of Habeas Corpus (hereafter "SAP") pursuant to 28

21   U.S.C. §2254.  Respondent Robert T. Hernandez (hereafter "Respon-

22   dent") filed an Answer to the SAP.  Petitioner has filed a Traverse

23   to Respondent's Answer.  The Court, having reviewed the SAP, the

24   Answer, the Traverse and the documents lodged therewith, finds that

25   Petitioner is not entitled to the relief requested and RECOMMENDS

26   that the Petition for Writ of Habeas Corpus be DENIED.

27

28

08cv0548

# I

## PROCEDURAL HISTORY

On June 26, 2003, an Information was filed charging Petitioner with making a criminal threat in violation of California Penal Code §422[1/] and attempted making of a criminal threat in violation of §422 and §664.  On March 16, 2004, a jury found Petitioner guilty of attempted making of a criminal threat. The trial court also found true that Petitioner had suffered two prior strike convictions under the Three Strikes Law [§667(b)-(i), 1170.2.12], two prior serious felonies [§667(a)(1)], and one prison prior [§667.5(b)].  The court sentenced Petitioner to 35 years to life imprisonment. (Respondent's Lodgment No. 1 at 80, 158-160, Court of Appeal opinion at 12). The sentence was comprised of an indeterminate term of 25 years to life imprisonment and two five-year terms for prior felony convictions. (Court of Appeal Opinion at 12).

Plaintiff appealed his conviction and sentence to the California Court of Appeal, Fourth Appellate District. (Appellant's Opening Brief, attached to the SAP).  The Court of Appeal affirmed the judgment and sentence in an unpublished decision. (Opinion of Court of Appeal, attached to the SAP, hereafter "Court of Appeal Opinion").

On March 24, 2008, Petitioner, proceeding *pro se*, filed a Petition for Writ of Habeas Corpus.  On June 2, 2008, Petitioner, still proceeding *pro se*, filed a First Amended Petition for Writ of Habeas Corpus.

---

[1/]     All further references to code sections are to the California Penal Code, unless otherwise noted.

08cv0548

1    On August 26, 2008, the Court granted Petitioner's Motion for
2    Appointment of Counsel due to his allegations that he was mentally
3    incompetent to proceed *pro se*.

4    On November 26, 2008, Petitioner's appointed counsel filed a
5    Petition for Writ of Habeas Corpus in the California Supreme Court
6    for purposes of exhausting Petitioner's state court remedies.   The
7    California Supreme Court denied the Petition without comment or
8    citation.

9    On August 20, 2009, the Court found that Petitioner's
10   original Petition, filed on March 24, 2008, was barred by the
11   statute of limitations, but that Petitioner was entitled to
12   equitable tolling of the statute of limitations due to his mental
13   illnesses.

14   On January 5, 2009, Petitioner filed the SAP. Respondent has
15   filed an Answer to the SAP. Petitioner has filed a Traverse to the
16   SAP.

17                                **II**

18                        **STATEMENT OF FACTS**

19   This Statement of Facts is taken substantially from the
20   Court of Appeal Opinion, *People v. Jasso*, No. D044766 (Cal. Ct.
21   App., 4th Dist., Div. 1)(attached to the SAP).   This Court relies on
22   these facts under 28 U.S.C. §2254(e)(1). <u>Park v. Raley</u>, 506 U.S. 20,
23   35-36 (1992)(holding that findings of historical fact, including
24   inferences properly drawn from such facts, are entitled to statutory
25   presumption of correctness).

26   On June 6, 2003, at approximately 10:30 PM, licensed taxi cab
27   driver Jorge Santiago (hereafter "Santiago") was at a taxi stand at
28   the San Ysidro border.   While Santiago was discussing a taxi cab

08cv0548

ride with a customer, Petitioner interrupted the conversation to tell the customer where the "raiteros" (unlicensed taxi cab drivers) were. Santiago told Petitioner to go away. Petitioner persisted on talking to the customer by stating, "The raiteros, we are over here. We are cheaper. You should come over here." The customer ignored Petitioner. Petitioner continued to try to get the customer to come with him. Santiago continued to tell Petitioner to leave. Petitioner became angry. As Petitioner was moving away, he stated that he was going to kill Santiago. The customer noticed Santiago's problem with Petitioner and left the area. Petitioner followed the customer, but the customer left in another taxi cab.

Petitioner returned to Santiago. Petitioner was still angry. Petitioner continued to threaten Santiago. Petitioner repeatedly stated that he was going to kill Santiago, that he was going to break the windows of Santiago's taxi cab, and that he was going to put Santiago in the trunk. Petitioner told Santiago that he (Petitioner) had shot and stabbed people in the past.

Juan Castro (hereafter "Castro"), another taxi cab driver who was standing near Santiago, advised Santiago not to let Petitioner near him and to call the police. When Castro told Santiago to call the police, Petitioner stated that if Santiago called the police, he would kill Santiago.

Santiago previously had heard that Petitioner had stabbed a person and then disappeared. Santiago took Petitioner's statements seriously, and was afraid that at any moment, Petitioner would stab him. Santiago felt that he could not move anywhere because Petitioner would follow him wherever he went. Santiago leaned back on a wall so he would not have to look behind him, and focused all

08cv0548

of his attention on Petitioner.  Santiago felt that the situation could not be controlled much longer, and that he was alert to see what Petitioner would do.  Since Petitioner kept returning to threaten Santiago, Santiago felt that he had to call the police, and did so twice on his cell phone.

After Santiago called the police the first time, Petitioner returned and made threats to Santiago.  Petitioner told Santiago that he had "already talked to the Logan guys so they can put you in the trunk." About 15 to 20 minutes after Santiago's first phone call to the police, Santiago called the police again to tell the 911 operator that the police had not yet arrived and that Petitioner continued to threaten him.  Santiago told the 911 operator that he could not see if Petitioner was carrying a weapon, but that Petitioner had told Santiago that he had a "point" and he was going to "poke him."  While Santiago was making the second 911 call, Castro heard Petitioner state that if Santiago was calling the police, he would kill Santiago.

When the police arrived, Petitioner hid in the bathroom of a nearby fast food restaurant until he was brought out by the police. While the police were interviewing Santiago and Castro, Petitioner repeatedly stated that he was going to "hang" Santiago. (Court of Appeal Opinion at 2-3).

**III**

**GROUNDS FOR RELIEF**

Petitioner raises 4 grounds for relief.

In Ground One, Petitioner contends that the improper admission of prior "bad acts" evidence violated his due process rights and deprived him of a fair trial.

08cv0548

1    In Ground Two, Petitioner contends that there was insuffi-
2    cient evidence to support his conviction for attempted criminal
3    threats.

4    In Ground Three, Petitioner contends that his 35-years-to-
5    life sentence for attempted criminal threats constitutes a dispro-
6    portionate sentence in violation of the Eighth Amendment's ban on
7    cruel and unusual punishment.

8    In Ground Four, Petitioner contends that he suffered
9    ineffective assistance of trial and appellate counsel because he was
10   "unable to help" them due to the psychotropic drugs he was taking.
11   Further, he contends that he suffered ineffective assistance of
12   trial counsel in that his trial counsel never told him that he was
13   facing a life sentence.  Additionally, he contends that he suffered
14   ineffective assistance of his appellate counsel for failing to file
15   a petition in the California Supreme Court that would exhaust his
16   state court remedies.

17                                **IV**

18                        **STANDARD OF REVIEW**

19   In order for federal subject matter jurisdiction over a
20   petition for writ of habeas corpus to lie, the petition must allege
21   that the petitioner is in custody in violation of the Constitution
22   or laws or treaties of the United States.   See 28 U.S.C.A. §
23   2254(a).

24   The Antiterrorism and Effective Death Penalty Act of 1996
25   ("AEDPA") applies to habeas corpus petitions filed after 1996.  The
26   current petition was filed on March 24, 2008 and is therefore
27   governed by the AEDPA.  To obtain federal habeas relief, Petitioner
28   must satisfy either § 2254(d)(1) or § 2254(d)(2).  See Williams v.

08cv0548

1   _Taylor_, 529 U.S. 362, 403 (2000).  The Supreme Court interprets

2   § 2254(d)(1)and (2) as follows:

> 3   Under the "contrary to" clause, a federal
> habeas court may grant the writ if the
> 4   state court arrives at a conclusion oppo-
> site to that reached by this Court on a
> 5   question of law or if the state court
> decides a case differently than this Court
> 6   has on a set of materially indistinguish-
> able facts.  Under the unreasonable appli-
> 7   cation" clause, a federal habeas court may
> grant the writ if the state court identi-
> 8   fies the correct governing legal principle
> from this Court's decisions but unreason-
> 9   ably applies that principle to the facts of
> the prisoner's case.

10

11   _Williams_, 529 U.S. at 412-13.

12       A state court's decision may be found to be "contrary to"

13   clearly established Supreme court precedent: (1) "if the state court

14   applies a rule that contradicts the governing law set forth in [the

15   Court's] cases" or (2) "if the state court confronts a set of facts

16   that are materially indistinguishable from a decision of [the] Court

17   and nevertheless arrives at a result different from the [the

18   court's] precedent." _Id._ at 405-406; _Lockyer v. Andrade_, 538 U.S.

19   63, 72-75 (2003).  A state court decision involves an "unreasonable

20   application" of clearly established federal law, "if the state court

21   identifies the correct governing legal rule from this Court's cases

22   but unreasonably applies it to the facts of the particular state

23   prisoner's case," or, "if the state court either unreasonably

24   extends a legal principle from our precedent to a new context where

25   it should not apply or unreasonably extends a legal principle from

26   our precedent to a new context where it should not apply or

27   unreasonably refuses to extend that principle to a new context where

28

08cv0548

1    it should apply." Williams, 539 U.S. at 407; Andrade, 538 U.S. at

2    76.

3         When there is no reasoned decision from the state's highest

4    court, the Court "looks through" to the underlying appellate court

5    decision.  Ylst v. Nunnmeaker, 501 U.S. 797, 801-06 (1991).  If the

6    dispositive state court order does not "furnish a basis for its

7    reasoning," federal habeas courts must conduct an independent review

8    of the record to determine whether the state court's decision is

9    contrary to, or an unreasonable application of, clearly established

10   Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th

11   Cir. 2000) (overruled in part by Andrade, 538 U.S. at 74-77).

12                                   V

13          **GROUND ONE: Admission of Prior Bad Acts**

14        Petitioner claims that the trial court violated his rights to

15   due process and a fair trial by admitting evidence of his prior "bad

16   acts."  Respondent argues that the admission of Petitioner's prior

17   "bad acts" did not violate his rights to due process and a fair

18   trial.

19        The prior "bad acts" evidence to which Petitioner refers is

20   Santiago's trial testimony that he had heard that Petitioner had

21   stabbed someone before (Respondent's Lodgment No. 2 at 103), and the

22   tape recording of Santiago's phone call to the police during which

23   Santiago stated that Petitioner "ha(d) a reputation of having

24   injured people with a knife." (Respondent's Lodgment No. 1 at 23,

25   25-31).

26        During motions *in limine* before trial, the prosecutor

27   informed the Court that she would introduce prior "bad act" evidence

28   that Petitioner purportedly had stabbed another taxi cab driver in

                                   8

                                                        08cv0548

1    1996.   The court ruled that the evidence was relevant to prove the

2    criminal threat element and victim's fear element of the charged

3    crime, Petitioner's intent that his statements be taken as threats,

4    and that the evidence was not more prejudicial than probative.

5    (Respondent's Lodgment No. 2 at 18-25).

6         The elements of the crime of making criminal threats are:

7    (1)Defendant willfully threatened to commit a crime which will

8    result in death or great bodily injury; (2) Defendant made the

9    threat with the specific intent that the statement be taken as a

10   threat, even if without an intent to actually carry it out; (3) the

11   threat was, on its face and under the circumstances in which it was

12   made, so unequivocal, unconditional, immediate, and specific as to

13   convey to the person threatened, a gravity of purpose and an

14   immediate prospect of execution of the threat; (4) the threat

15   actually caused the person to be in sustained fear; and (5) the

16   person's fear was reasonable under the circumstances. [Court of

17   Appeal Opinion at 8, citing People v. Toledo, 26 Cal. 4th 221,

18   228(2001)].

19        With regard to this claim, the Court of Appeal found the

20   following:

21        The prosecutor's offer of proof indicated that the
          prior and current offenses both involved (Peti-

22        tioner's) aggressive behavior towards a cab driver at
          the border.  The fact that (Petitioner) had actually

23        stabbed a cab driver on a previous occasion created
          a strong inference that he intended his statements to
          Santiago to be taken as a serious threat...

24        The offenses were similar enough to support an
          inference of (Petitioner's) intent that his state-

25        ments be taken as threats.  The same conclusion
          applies to the issue of the victim's sustained

26        fear...
          (Court of Appeal Opinion at 5-6).

27

28        As a threshold matter, courts adjudicating petitions for writ

9

08cv0548

of habeas corpus do not ordinarily review questions about the admissibility of evidence. <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991). A federal court may not interfere with a state court evidentiary ruling but may examine whether the evidence admitted was so prejudicial that its admission violated due process and the right to a fair trial. <u>Fuller v. Roe</u> 182 F.3d 699, 703 (9th Cir. 1999). "A federal court cannot disturb on due process grounds a state court's decision to admit prior bad acts evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair." <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995).

Federal Rule of Evidence 404(b) states in pertinent part:

> Evidence of other crimes, or acts... may be admissible (to prove) motive, opportunity, *intent*, preparation, plan, knowledge, identity, or absence of mistake or accident...
> (emphasis added).

In <u>McKinney v. Rees</u>, 993 F.2d 1378, 1381-1382 (9th Cir. 1992), *cert. denied* 510 U.S. 1020 (1993), the Ninth Circuit addressed the question of "whether the admitted evidence of Defendant's other acts was relevant to a fact of consequence, or was only evidence of character to show propensity" to commit the charged crime. The court determined that if the other act evidence "tended to make any fact relevant and (the elements of the charged crime) more or less probable, it was relevant and admissible. <u>Smith v. Roe</u> 232 F.Supp 2d 1073, 1086 (C.D. Cal. 2002).

Further, in <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991), the court acknowledged its previous holdings that admission of prior "bad acts" only vitiates due process if there are no permissible inferences the jury can draw from the evidence.

08cv0548

1    Here, it is clear that the Court of Appeal's decision

2    regarding the admission of the "bad acts" evidence comported with

3    Petitioner's rights to due process and a fair trial.  The Court of

4    Appeal explicitly found that the "bad acts" evidence created the

5    strong permissible inferences that Petitioner intended his state-

6    ments to be serious threats to Santiago and because of Santiago's

7    previous knowledge about Petitioner, Santiago reasonably feared for

8    his safety. The intent that the statements be taken as a threat and

9    that the statements in fact caused the person to be in sustained

10   fear, are both elements of the crime of attempted criminal threats.

11   Therefore, the statements tended to make those elements  of the

12   charged crime more probable, relevant and admissible. Further, the

13   "bad acts" evidence comported with the Federal Rules of Evidence and

14   federal law as decided by the Ninth Circuit.[2]

15       As a result, Petitioner has failed to demonstrate that the

16   introduction of the "bad acts" evidence was so prejudicial that it

17   violated his rights to due process and to a fair trial. See Jammal,

18   926 F.2d at 919.

19       Accordingly, the Court finds that the Court of Appeal's

20   adjudication of Petitioner's claim in this regard was neither

21   contrary to, nor involved an unreasonable application of, clearly

22   established federal law, and was not based on an unreasonable

23   determination of the facts in light of the evidence presented in the

24   state court proceedings.  Therefore, the Court RECOMMENDS that

25

26   [2]   The Court recognizes that this evidence may have been inadmissible
         hearsay.  However, the evidence was not admitted for the truth of
27       the matters about which Santiago testified.   See Fed. R. Evid.
         801(c).  The trial court did not give a limiting instruction that
28       this evidence could not be used to prove its truth.  But, the
         prosecutor did not argue to the jury that this evidence should be
         considered for its truth or for any other impermissible purpose.

08cv0548

1  Petitioner's claim in this regard be DENIED.

VI

**GROUND TWO: Sufficiency of Evidence**

4      Petitioner argues that there was insufficient evidence to
5  establish all of the elements of attempted criminal threats.
6  Specifically, Petitioner asserts that his statements to Santiago
7  were not immediate and specific enough to convey a gravity of
8  purpose and an immediate prospect of execution. Respondent argues
9  that there was sufficient evidence to establish all of the elements
10 of attempted criminal threats.

11     The clearly established federal law regarding sufficiency of
12 the evidence claims in the criminal context is set forth in <u>Jackson</u>
13 <u>v. Virginia</u>, 443 U.S. 307, 319 (1979).  In <u>Jackson</u>, the Court held
14 that the Fourteenth Amendment's Due Process Clause is violated, and
15 an applicant is entitled to habeas corpus relief, "if it is found
16 that upon the record evidence adduced at the trial no rational trier
17 of fact could have found proof of guilt beyond a reasonable doubt."
18 <u>Jackson</u>, 443 U.S. at 324.   In making this determination, habeas
19 courts must respect the province of the jury to determine the
20 credibility of witnesses, resolve evidentiary conflicts, and draw
21 reasonable inferences from proven facts by assuming the jury
22 resolved all conflicts in a manner that supports the verdict.   <u>Id.</u>
23 at 319.  Once a state court fact finder has found a defendant
24 guilty, federal habeas courts must consider the evidence "in the
25 light most favorable to the prosecution."   <u>Id.</u>   Federal habeas
26 courts must also analyze <u>Jackson</u> claims "with explicit reference to
27 the substantive elements of the criminal offense as defined by *state*
28 law."   <u>Id.</u> at 324 n.16 (emphasis added).

08cv0548

1    The Ninth Circuit has stated that: "After AEDPA, we apply the
2    standards of Jackson with an additional layer of deference." Juan
3    H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005).  In Allen, the
4    Ninth Circuit first reviewed the standard of review applied by the
5    state appellate court to a sufficiency of evidence claim, and found
6    that although the state court did not cite to the relevant federal
7    case law, "such a citation is not required 'so long as neither the
8    reasoning nor the result of the state-court decision contradicts'
9    Supreme Court precedent."  Id. at 1274 n. 12, quoting Early v.
10   Packer, 537 U.S. 3, 8 (2002).

11       In this case, the California Court of Appeal applied a
12   standard similar to Jackson and similar to that applied by the state
13   court in Allen (Court of Appeal Opinion at 9-11), and this Court
14   must similarly determine whether the state appellate court opinion
15   here "reflected an unreasonable application of Jackson . . . to the
16   facts of this case." Allen, 408 F.3d at 1275.

17       Viewing the evidence "in the light most favorable to the
18   prosecution," as this Court must, it is clear that sufficient
19   evidence was adduced at trial to support the gravity and immediacy
20   requirements of attempted criminal threats under California law.

21       Plaintiff contends that there was insufficient evidence on
22   the third element of the charged crime: "the threat was, on its face
23   and under the circumstances in which it was made, so unequivocal,
24   unconditional immediate, and specific as to convey to the person
25   threatened, a gravity of purpose and immediate prospect of execution
26   of the threat." To support this argument, Petitioner cites the
27   testimony of Castro: Petitioner stated that if Santiago were to call
28   the police, he would kill Santiago (Respondent's Lodgment No. 2 at

08cv0548

50); when Petitioner approached Santiago, Santiago moved back and away from Petitioner (Respondent's Lodgment No. 2 at 53); Petitioner left the area when Santiago called the police (Respondent's Lodgment No. 2 at 53); Petitioner did not return for five to ten minutes (Respondent's Lodgment No. 2 at 53-54); when Petitioner returned, Santiago was on the phone with the police, and Petitioner did not attempt to harm Santiago (Respondent's Lodgment No. 2 at 54-55); shortly thereafter, the police arrived and Petitioner ran to McDonald's where he hid from the police (Respondent's Lodgment No. 2 at 55); and it was not until the police had taken Petitioner into custody that Petitioner stated that he would "hang" Santiago (Respondent's Lodgment No. 2 at 55).

Petitioner concludes that the evidence demonstrates that Santiago did not believe Petitioner's threats to be grave and immediate. If he did, Santiago would have tried to get help or get away from Petitioner when Petitioner left the area, and immediately would have called the police. Moreover, Petitioner's failure to act on any of his threats when Santiago was on the phone with the police, indicate that the threats were not immediate.

The Court of Appeal stated the following with respect to this claim:

> The argument lacks merit both factually and legally. The record contains evidence of both unconditional and conditional threats to kill (Santiago). Santiago's testimony described (Petitioner's) repeated statements that (Petitioner) was going to kill him, without referring to a condition that the police be called... Castro described threats conditioned on a call to the police. Because our review of a challenge to the sufficiency of the evidence requires us to draw all reasonable inferences in favor of the judgment, we presume the jury included Santiago's description of unconditional threats as among the acts supporting a guilty verdict.
> In any event, the law does not support (Petitioner's)

08cv0548

assertion that the call-the-police condition removed the threats from the ambit of section 422. Interpreting section 422's phrase 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' the courts have concluded that the term 'so' indicates 'that unequivocality, unconditionality, immediacy and specificity *are not absolutely mandated*, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' Further, the 'use of the word 'unconditional' was not meant to prohibit prosecution of all threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.' 'Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution.'

The jury could reasonably conclude that the threats conditioned on a call to the police conveyed the requisite gravity and immediate prospect of execution. Summoning the police is the expected response to threatening behavior; thus, the condition was illusory. Further, the condition attached to the threat was ultimately satisfied because Santiago *did* call the police. Indeed, Castro testified that as Santiago was speaking with the 911 operator during his second phone call, (Petitioner) stated "If you are calling the police, I'm going to kill you."

The concept of an immediate *prospect* of execution does not require that the threat convey that it will be carried out instantly. Rather, the element is established if the circumstances show that the threat communicates to the victim that it truly will be carried out at some point.

The fact that Santiago did not take... various protective measures... did not compel a finding that the threats did not convey an immediate prospect of execution. In rendering its verdict, the jury could have considered the evidence that (Petitioner) was visibly angry; (Petitioner) was repeatedly returning to make the threats to Santiago; (Petitioner) told Santiago that he had stabbed people before; and Santiago was sufficiently alarmed that he focused all his attention on (Petitioner), stood by a wall to protect his back, and called 911 twice. These circumstances support the jury's finding that the threats conveyed an immediate prospect that they would be carried out.

(Court of Appeal Opinion at 9-11);(citations and footnotes omitted); (emphasis added).

08cv0548

1

2      This Court agrees with the Court of Appeal.  The record

3  presented to the Court is replete with evidence that Petitioner

4  aggressively, menacingly, and angrily approached Santiago over at

5  least a 20 minute period. (Respondent's Lodgment No. 2 at 48, 51,

6  73-75, 93-94, 104).  Further, Petitioner unconditionally threatened

7  to kill Santiago on at least two separate occasions, (Respondent's

8  Lodgment No. 2 at 93-95), and that Petitioner unconditionally

9  threatened to break Santiago's taxi cab's windows and put Santiago

10  in the trunk of his own taxi cab. (Respondent's Lodgment No. 2 at

11  94-95, 102). Additionally, Petitioner told Santiago that he shot and

12  stabbed people. (Respondent's Lodgment No. 2 at 101).  Santiago was

13  fearful of Petitioner and believed that Petitioner would carry out

14  his threats. (Respondent's Lodgment No. 2 at 102-104).  Santiago

15  believed he could not move anywhere without Petitioner threatening

16  him, so he moved himself to a location where he would not have to

17  look behind his back to see if Petitioner was there. (Respondent's

18  Lodgment No. 2 at 102-103).

19      Moreover, with regard to Petitioner's threats not being

20  specific enough "to convey a gravity of purpose," Santiago called

21  the police on two separate occasions. (Respondent's Lodgment No. 2

22  at 102, 104). Calling the police is a reasonable response to being

23  criminally threatened.   It is clear that the jury reasonably

24  concluded that Petitioner's threats "convey(ed) a gravity of

25  purpose" because there would have been no reason for Santiago to

26  have called the police, other than in response to Petitioner's

27  threats.

28      Further, that Santiago did not take protective measures in

light of Petitioner's threats does not mean that Petitioner's

16

1    threats did not convey an "immediate prospect of execution."  As

2    previously noted, the record presented to the Court clearly shows

3    that Petitioner was visibly angry when he made the threats to

4    Santiago, Petitioner told Santiago that he (Petitioner) shot and

5    stabbed people and Santiago responded to the threats by focusing all

6    of his attention on Petitioner and stood in a location so as to not

7    have to look behind himself.  It is clear that the jury reasonably

8    concluded that Petitioner's threats conveyed an "immediate prospect

9    of execution." Santiago's responses to Petitioner's threats,

10    positioning himself in a location of seeming safety and twice

11    calling the police, were reasonable responses to Petitioner's

12    behavior and threats and show that Santiago believed that Petitioner

13    would immediately act on this threats.

14       Therefore, viewing this evidence in the light most favorable

15    to the judgment, it is entirely reasonable that the jury found

16    Petitioner guilty of the third element of attempted criminal

17    threats. The Court respects the province of the jury to resolve

18    evidentiary conflicts, which it clearly did, because all conflicts

19    in the evidence were resolved in a manner that supported its

20    verdict. Jackson, 443 U.S. at 319.

21       Accordingly, there was sufficient evidence in the record to

22    support a finding of the third element of attempted criminal threats

23    beyond a reasonable doubt.  Therefore, the Court RECOMMENDS that

24    Petitioner's claim in this regard be DENIED.

25                      **VII**

26        **GROUND THREE: Cruel and Unusual Punishment**

27       Petitioner claims that his sentence of 35 years to life

28    imprisonment constitutes cruel and unusual punishment and is grossly

08cv0548

1   disproportionate to the crime of which he was convicted.  Respondent

2   argues that Petitioner's sentence does not constitute cruel and

3   unusual punishment and is not grossly disproportionate to Peti-

4   tioner's crime.

5        The Eighth Amendment proscribes the infliction of "cruel and

6   unusual punishment." U.S. Const., Amendment VIII.  In Ewing v.

7   California, 538 U.S. 11 (2003), the United States Supreme Court

8   explained that while the constitutional principle of proportionality

9   between crime and sentence applies in noncapital sentences, "(t)he

10  Eighth Amendment does not require strict proportionality... Rather

11  it forbids only extreme sentences that are 'grossly disproportion-

12  ate' to the crime. Id., at 23 (citations omitted). The gross

13  disproportionality principle applies "only in the 'exceedingly rare'

14  and 'extreme' case. Lockyer v. Andrade, 538 U.S. 63, 73

15  (2003)(citations omitted).

16       In Ewing, the United States Supreme Court held that a

17  sentence of 25 years to life imprisonment for felony grand theft was

18  not "grossly disproportionate" to the crime when the defendant had

19  previously been convicted of three residential burglaries and a

20  robbery. Ewing, 538 U.S. at 18, 30-31.

21       In Andrade, the United States Supreme Court acknowledged that

22  its precedents had "not been the model of clarity" and that it had

23  "not established a clear or consistent path for courts to follow."

24  Andrade, 538 U.S. at 72.

25       The Ninth Circuit has given this Court some guidance as to

26  the kind of "exceedingly rare" Eighth Amendment claim that warrants

27  federal habeas relief.  See Duhaime v. Ducharme, 200 F.3d 597, 600

28  (9th Cir. 2000) ["(Ninth Circuit) cases may be persuasive authority

08cv0548

for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'"].  In two recent cases, the court overturned Three Strikes Law sentences where either the triggering offense or the defendant's prior criminal history were not sufficiently serious.

In Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), the court concluded that a sentence of 25 years to life imprisonment for a nonviolent shoplifting of a $199.00 VCR where the defendant's prior convictions were two nonviolent second degree robberies violated the Eighth Amendment.  Ramirez, 365 F.3d at 775.  Ramirez's prior robberies did not involve weapons, and the "force" in both was minimal.  Id. at 768.  Moreover, the one-year jail term Ramirez received for the two robberies was also indicative of the less-than-serious nature of the offenses, and it "was the only period of incarceration ever imposed upon Ramirez prior to his Three Strikes sentence."  Id. at 769.  Comparing Ramirez's case to Rummel v. Estelle, 445 U.S. 263 (1980), Solem v. Helm, 463 U.S. 277 (1983), and Andrade, the court concluded that "this [was] the extremely rare case that gives rise to an inference of gross disproportionality."  Id. at 770, 775.  After conducting intra- and interjurisdictional comparisons of Ramirez's sentence, the court found the state court's decision to uphold Ramirez's sentence was an objectively unreasonable application of clearly established Supreme Court law.  Id. at 770-73 ; see also Reyes v. Brown, 399 F.3d 964 (9th Cir. 2005) (noting that Reyes' sentence of 26 years to life imprisonment for a "triggering felony" of perjury on a driver's licence application stated a "plausible case" for relief under Ramirez and remanding to

1  the district court for an evidentiary hearing on the gravity of

2  Reyes's prior conviction for armed robbery).

3      Most recently, the Ninth Circuit struck down a sentence of

4  25 years to life imprisonment imposed on a defendant who had failed

5  to update his sex offender registration within five days of his

6  birthday.  Gonzalez v. Duncan, 551 F.3d 875 (9th Cir. 2008).  The

7  court first considered whether the sentence gave rise to an

8  inference of gross disproportionality by examining both the gravity

9  of the offense and the severity of the penalty.  Id. at 883-87.

10     With regard to the gravity of the offense, the court

11 concluded that California law had defined Gonzalez's crime as simply

12 a "technical regulatory requirement that resulted in no social harm

13 and to which little or no moral culpability attaches."  Id. at 887.

14 It also considered Gonzalez's prior criminal history, which was

15 extensive and serious, including possession of drugs, car theft,

16 attempted forcible rape, lewd conduct with a child under the age of

17 fourteen, robbery and spousal abuse.  The Court found, however, that

18 there was no "rational relationship between Gonzalez's failure to

19 update his sex offender registration annually and the probability

20 that he will recidivate as a violent criminal or sex offender."  Id.

21 at 887.  This lack of connection between Gonzalez's past behavior

22 and his current conviction could not justify an increased sentence

23 for the "passive, harmless and technical violation of the registra-

24 tion law" of which Gonzalez was convicted.  Id. at 885.  Gonzalez's

25 sentence was the "third most severe penalty available under

26 California law, exceeded in severity only by death and life

27 imprisonment without the possibility of parole."  Id. at 886.

28 Accordingly, his sentence raised an inference of gross

08cv0548

1   disproportionality.  Id. at 887.

2       The  Gonzalez  court  then  conducted  intra-  and

3   interjurisdictional comparisons and found that the 28 year to life

4   imprisonment sentence imposed on Gonzalez was "substantially more

5   severe than penalties California imposes for far more serious

6   crimes," including second degree murder (fifteen years to life),

7   voluntary manslaughter (three, six, or eleven years), and rape

8   (three, six, or eight years).  Id.  Moreover, the court found that

9   "[i]n at least ten jurisdictions, a first registration offense is a

10  misdemeanor[,]" and "Texas appears to be the only state besides

11  California that would *mandate* a sentence of 25 years or longer for

12  a third felony offense, including a violation of a sex offender

13  registration law."  Id. at 888.  Accordingly, Gonzalez's sentence

14  violated the Eighth Amendment.  Id. at 889.

15      However, the Ninth Circuit has upheld Three Strikes sentences

16  in cases where either the triggering offense or the defendant's

17  prior record involve violence or the threat of violence.  Thus, in

18  Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the court concluded

19  that a sentence of 25 years to life imprisonment for a conviction

20  for a felony petty theft did not violate the Eighth Amendment

21  because Rios "struggled with the loss prevention officer and tried

22  to avoid apprehension, . . . his prior robbery 'strikes' involved

23  the threat of violence because his cohort used a knife, [and]...

24  Rios [had] a lengthy criminal history, beginning in 1982, and he

25  ha[d] been incarcerated several times."  Id. at 1086.

26      In Taylor v. Lewis, 460 F.3d 1093 (9th Cir. 2006) the Court

27  upheld a sentence of 25 years to life imprisonment for felony

28  possession of cocaine and misdemeanor possession of drug parapherna-

08cv0548

lia.  Although the triggering offense was nonviolent, Taylor's prior convictions included second-degree burglary, robbery with a firearm, and voluntary manslaughter with the use of a weapon.  Id. at 1100. Furthermore, "[his] history of recidivism, marked by violence and the intentional taking of human life and spanning some 30 years, is a great deal more severe than the criminal records considered in Rummel and Andrade and probably even more severe than in Ewing." Id. at 1101.

Similarly, in Nunes v. Ramirez-Palmer, 485 F.3d 432 (9th Cir. 2007), the Ninth Circuit upheld a sentence of 25 years to life imprisonment for a felony petty theft charge where the defendant's prior record was lengthy and violent.  His prior record included two rape convictions and various convictions for burglary, robbery and thefts and began in 1945 when Nunes was twenty years old.  Id. at 436-37, 439.

Petitioner's case is readily distinguished from Ramirez and Gonzalez, and is much closer factually to Rios, Taylor and Nunes. Petitioner has a lengthy criminal record and has had frequent contact with the criminal justice system since he was first arrested in 1978 and 1979 for two vehicular offenses, one of which was a felony.  For these offenses, Petitioner was given probation.

In 1980, Petitioner was convicted in the same case of three felonies: lewd act on a child, attempting to induce false testimony, and burglary.  For these offenses, he was given probation.

In 1983, Petitioner was convicted with assault with a firearm. He was sentenced to four years in prison.  This was his first strike prior.

In 1992, he was convicted of burglary for which he was

1    sentenced to two years in prison after violating his probation.

2         In 1995, he pled guilty to misdemeanor drunk driving.

3         In 1996, he was convicted of assault with a deadly weapon

4    with personal infliction of great bodily injury.  This conviction

5    was the result of the prior stabbing at the border.  He was

6    sentenced to seven years imprisonment.  This was his second strike

7    prior.

8         In 2003, he committed, and in 2004, was convicted of,

9    attempted criminal threats, the offense that is the subject of the

10   instant Petition.

11        Petitioner's long history of recidivism, which includes

12   violence or the threat of violence, coupled with the fact that

13   attempted criminal threats is not a "technical" violation of the

14   law, compel this Court's conclusion that Petitioner's case is not

15   the "extremely rare" case which gives rise to an inference of

16   disproportionality.  Therefore, the Court need not engage in an

17   intra- and interjurisdictional comparison of Petitioner's sentence

18   as the "threshold question" of an "inference of gross

19   disproportionality" has not been met.  See Harmelin v. Michigan, 501

20   U.S. 957, 1005 (1991), Ramirez, 365 F.3d at 770; see also Nunes, 485

21   F.3d at 439; Taylor, 460 F.3d at 1101; Rios, 390 F.3d at 1086.

22   Accordingly, the California Court of Appeal's rejection of Peti-

23   tioner's Eighth Amendment claim was neither contrary to, nor an

24   unreasonable application of, clearly established Supreme Court law.

25   See Williams, 529 U.S. at 412-13.  As a result, the Court RECOMMENDS

26   that Petitioner's claim in tis regard be DENIED.

27

28

08cv0548

# VIII

## GROUND FOUR: Ineffective Assistance of Counsel

### 1. Failure To Raise Competence

Petitioner claims that he suffered ineffective assistance of counsel at trial and on appeal because his trial and appellate counsel failed to raise the issue of his incompetence to stand trial and to assist in his defense.  Respondent asserts that Petitioner was competent to stand trial and to assist in his defense, and there is no evidence in the record to establish that he was not competent to stand trial and to assist in his defense.

Petitioner presented this claim to the California Supreme Court which this Court allowed him to file in order to exhaust his state court remedies. The California Supreme Court denied this claim on the merits without comment or citation.  Where, as here, the denial of the claim on the merits is without comment or citation, a federal court independently reviews the record to determine whether the silent state court decision is objectively unreasonable. Himes v. Thompson 336 F.3d 848, 853 (9th Cir. 2003).

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984).  See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States.").  Under Strickland, Petitioner must show both incompetence of counsel and prejudice in order to justify issuance of the writ.  Strickland, 466 U.S. at 688.  However, the Court need not address both prongs if the defendant fails to make a sufficient showing of either one.  Id. at 697.

08cv0548

A petitioner can establish ineffective assistance of counsel by showing counsel's performance fell below an objective standard of reasonableness. Id. at 688. However, judicial scrutiny of counsel's performance should be highly deferential. Id. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. at 686-87. Furthermore, where the ineffective assistance of counsel claim is based on appellate counsel's failure to raise viable issues, a petitioner's burden is even higher. Smith v. Robbins, 528 U.S. 259, 288 (2000). In such cases it is more difficult for a petitioner to establish that appellate counsel was incompetent because "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id., citing Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

A petitioner can establish prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Fretwell v. Lockhart, 506 U.S. 364, 372 (1993). With respect to claims of ineffective assistance of appellate counsel, this means that a petitioner must demonstrate that he would have prevailed on appeal absent counsel's errors. Robbins, 528 U.S. at 285 (2000), citing Smith v. Murray, 477 U.S. 527, 535-36 (1986).

In Pate v. Robinson, 383 U.S. 375, 386 (1966), the United States Supreme Court held that a state must follow adequate procedures to protect against the conviction of a criminal defendant who is incompetent to stand trial. "To be competent to stand trial,

08cv0548

a defendant must demonstrate an ability 'to consult with his lawyer
with a reasonable degree of rational understanding' and a 'rational
as well as factual understanding of the proceedings against him.'"
McMurtrey v. Ryan 539 F.3d 1112, 1118 (9th Cir. 2008), quoting
Godinez v. Moran, 509 U.S. 389, 396 (1993)(citations omitted).  When
the "evidence raises a *bona fide* doubt" about the defendant's
competence to stand trial, a trial judge must *sua sponte* conduct an
evidentiary hearing. Pate, 383 U.S. at 385 (emphasis in original).

Due process requires a state court to hold a hearing where
substantial evidence before the court "indicate(s) the need for
further inquiry" into the defendant's competency.  Since there are
no "fixed or immutable signs which invariably indicate the need for
further inquiry to determine fitness to proceed, the question is a
difficult one in which a wide range of manifestations and subtle
nuances are implicated." Drope v. Missouri, 420 U.S. 162, 180
(1975). "Although no particular facts signal a defendant's incompe-
tence, suggestive evidence includes the defendant's demeanor before
the trial judge, irrational behavior of the defendant, and available
medical evaluations of the defendant's competence to stand trial."
McMurtrey, 539 F.3d at 1118-1119, quoting Williams v. Woodford, 384
F.3d 567, 604 (9th Cir. 2004).

Here, Petitioner contends that his trial counsel had reason
to question his competence to stand trial and to assist in his
defense.  Petitioner states that prior to and during his trial, he
was taking numerous psychotropic medications including Seroquel,[3/]

---

[3/]    Seroquel is a medication used to treat schizophrenia and bipolar
disorder. (www.drugs.com).

08cv0548

Sinequan,[4]   Prozac,[5]   Compazine,[6]   Lorazapam,[7]   and   Risperdal.[8]
(Petitioner's Lodgment SD at 2030-2035).   Further, Petitioner
contends that prior to and during trial, he complained of hearing
voices and was on suicide precaution status. (Petitioner's Lodgment
SD at 47, 1479-1480, 1482-1483, 1489, 1510-1511, 1521, 1539, 1546).
Further, he was diagnosed as suffering from schizophrenia, depres-
sive type, and possible bipolar disorder. (Petitioner's Lodgment RJ
at 441, 581).   In addition, at Petitioner's Preliminary Hearing, he
requested to see medical personnel at the prison for a "psychiatric
problem." (Respondent's Lodgment No. 2, Transcript of Preliminary
Hearing at 22).

However, the only evidence before the court that Petitioner
was suffering from a mental illness was presented in the May 11,
2004 Probation Officer's Report. (Respondent's Lodgment No. 1 at
127-137). In the Probation Officer's Report, the Probation Officer
noted, "(t)he defendant has been diagnosed with bipolar disorder and
schizophrenia.   He has been taking medications prescribed by the
clinic for those disorders..." (Respondent's Lodgment No. 1 at 133).
Notably, the Probation Officer stated that there were no possible
circumstances in mitigation that should be considered in sentencing.
(Respondent's Lodgment No. 1 at 133). The Court also notes that

---

[4] Sinequan is a medication used to treat depression and anxiety. (www.drugs.com).

[5] Prozac is a medication used to treat depression and anxiety. (www.drugs.com).

[6] Compazine is a medication used to treat schizophrenia. (www.drugs.com).

[7] Lorazepam is a medication used to treat depression and anxiety. (www.drugs.com).

[8] Risperdal is a medication used to treat schizophrenia and bipolar disorder. (www.drugs.com).

08cv0548

1    Petitioner's counsel's June 3, 2004 Sentencing Statement does not

2    mention Petitioner's mental illnesses nor the medication Petitioner

3    had been prescribed. (Respondent's Lodgment No. 1 at 139-146).

4    Further, at Petitioner's June 14, 2004 sentencing hearing, the court

5    noted that it had read the Probation Officer's Report (Respondent's

6    Lodgment No. 2, Vol. 5 at 701), and Petitioner's counsel's Sentenc-

7    ing Statement (Respondent's Lodgment No. 2, Vol. 5 at 702), and

8    acknowledged that Petitioner had been diagnosed with bipolar

9    disorder and schizophrenia. However, the court noted that "(Peti-

10    tioner) continues his use of alcohol and is a danger to society,

11    which is the bottom line for the court." (Respondent's Lodgment No.

12    2, Vol. 5 at 703). Significantly, the court did not address

13    Petitioner's mental illnesses, presumably because Petitioner had not

14    acted inappropriately at any time during the court proceedings.

15    Moreover, the record presented to the Court is silent that Peti-

16    tioner's counsel and the trial court knew the medications Petitioner

17    was taking to control his mental illnesses. Therefore, the Court

18    cannot conclude that there was substantial evidence before the trial

19    court, or that Petitioner's counsel had any reason to know, that

20    Petitioner was not able to consult with his counsel with a reason-

21    able degree of rational understanding and a rational and factual

22    understanding of the proceedings against him. Therefore, there was

23    no "*bona fide* doubt" about Petitioner's competence to stand trial

24    and to assist his attorney with his defense. In fact, the contrary

25    appears to be true.

26        First, there is no evidence in the record that Petitioner's

27    counsel or the court, knew before, during and after trial that

28    Petitioner was taking the above-noted medications. Further, there

08cv0548

1   is no evidence in the record to establish that Petitioner's demeanor

2   or behavior while in court or otherwise, raised even a doubt, much

3   less a "*bona fide* doubt," that Petitioner was not competent to stand

4   trial or to assist in his defense.

5       On March 8, 2004, the date Petitioner's trial began,

6   Petitioner personally made a motion to replace his counsel. The

7   motion was denied. (Respondent's Lodgment No. 1 at 178). Peti-

8   tioner's ability to make the motion to replace his counsel demon-

9   strated his ability to consult with his counsel with a rational

10   degree of understanding. In making the motion, Petitioner exhibited

11   the ability to formulate his opinion that he disagreed with the

12   advice his counsel had given him, or with what his counsel was doing

13   or not doing to present his defense.

14       Second, on March 22, 2004, at the trial on Petitioner's prior

15   convictions, Petitioner exhibited the ability to insist, against his

16   counsel's advice, to submit a neatly written letter to the court

17   that acknowledged that he was facing a sentence of life imprison-

18   ment. (Respondent's Lodgment No. 2 at 606). The letter states in

19   pertinent part:

20          I understand that for some reason, I am facing 25
years to life for my case... I simply cannot bear the

21       thought of spending the rest of my life isolated from
my family, which I love so dearly - especially after

22       finally beginning to make the kind of changes in my
life I need to make to stay out of trouble and be

23       there for my family.
(Respondent's Lodgment No. 1 at 126)

24

25       Petitioner's writing of the letter and insistence on

26   submitting the letter to the court demonstrates that he had a

27   rational and factual understanding of the proceedings against him.

28   His writing of the letter and insistence upon its submission to the

08cv0548

1   court certainly did not raise a "*bona fide* doubt" about Petitioner's

2   competence to stand trial or assist in his defense.

3       Third, the medical and psychiatric records submitted by

4   Petitioner in connection with his Motion for Equitable Tolling

5   confirm that Petitioner had the competency to stand trial and to

6   assist with his defense.  The medical and psychiatric records dated

7   from prior to Petitioner's trial through Petitioner' sentencing[2/]

8   indicate that mental health professionals at the prison where

9   Petitioner was housed found Petitioner to be "alert" and "oriented."

10   Petitioner was prescribed and took medications to address his mental

11   illnesses as well as his physical problems.  Petitioner was aware

12   and sought help for his medical and mental illnesses when the need

13   arose.  Petitioner was aware of and discussed his court proceedings

14   with medical and mental health personnel.  Petitioner generally

15   interacted appropriately with prison staff and other inmates.

16   (Petitioner's Lodgment SD at 23-24, 31, 47, 61, 353, 1473-1491,

17   1494-1495, 1510 - 1511, 1513-1515, 1521-1522, 1525-1526, 1530-1531,

18   1534-1535, 1540, 1546, 1553, 1558, 1560-1567, 2203-2204).

19       On March 8, 2004, the date Petitioner's trial began,

20   Petitioner's treating physician and mental health professionals at

21   the prison stated, "(Petitioner) has not displayed any overt (signs)

22

23     [2/]    Petitioner was arrested on June 6, 2003. (Respondent's Lodgment No.
24   1 at 1).

       Petitioner's Preliminary Examination was held on June 25, 2003.
25   (Respondent's Lodgment No. 2, Transcript of Preliminary Hearing).

26       Petitioner's trial was held from March 8, 2004 to March 16, 2004.
       (Respondent's Lodgment No. 2, Vols. 1-4).

27       The trial on Petitioner's prior convictions was held on March 22,
       2004. (Respondent's Lodgment No. 2, Vol. 4).

28       Petitioner's sentencing hearing was held on June 14, 2004.
       (Respondent's Lodgment No. 2, Vol. 5).

08cv0548

1   of thought disorder lately... He has been medically stable here and

2   is being monitored on an ongoing basis." Petitioner's mental health

3   professionals also noted that they were aware that Petitioner was

4   scheduled to be in court, that Petitioner may be stressed by the

5   legal proceedings, and that Petitioner is "likely to face serious

6   prison time." (Petitioner's Lodgment SD at 1510). That same day,

7   Petitioner was observed as he left the prison to go to court, to be

8   "alert, coherent and ambulatory." (Petitioner's Lodgment SD at

9   1553).

10        After Petitioner was found guilty of attempted criminal

11  threats, on March 17, 2004, Petitioner's mental health professionals

12  reported that Petitioner was "alert and oriented," "speech (was)

13  clear and coherent with good eye contact," that Petitioner reported

14  "he was at court for a week and a half and claimed they found him

15  guilty and (that he) planned to appeal for another trial." The

16  report also noted that "earlier that day, (Petitioner) heard voices

17  telling him to hurt himself so right away (he stood) up and went to

18  (the) patio and talk to people," and that at the time of the report,

19  Petitioner "no longer heard voices and felt better." (Petitioner's

20  Lodgment SD at 1561). Another report from the same day indicated

21  that Petitioner was aware he had additional court appearances, he

22  thought his legal rights were being violated and that he wanted a

23  new set of jurors and a different attorney. Also, Petitioner joined

24  a group activity with good participation, and socialized with select

25  peers. (Petitioner's Lodgment SD at 1563).

26        Petitioner's mental health professionals' observations and

27  reports about Petitioner from prior to trial to after Petitioner's

28  sentencing do not show that Petitioner's mental illnesses or the

medications he was taking for his mental illnesses, in any way compromised his ability to assist his counsel with a rational degree of understanding.  Nor do those observations and reports reflect that Petitioner did not have a rational and factual understanding of the proceedings against him.  Therefore, even if Petitioner's counsel and the court were aware of Petitioner's mental health records generated prior to, during, and after Petitioner's trial, there was no doubt, much less a "*bona fide* doubt," about Petitioner's competence to stand trial and to assist in his defense.

Consequently, the Court can not find that Petitioner's trial and appellate counsel were ineffective for failing to raise Petitioner's competence to stand trial and assist in his defense. Petitioner has failed to show that his trial and appellate counsel's performance fell below an objective standard of reasonableness. The record is silent that Petitioner's counsel knew or should have known that Petitioner suffered from mental illnesses. If she did not know that Petitioner suffered from illnesses, she could not present that fact to the trial court.  Further, the record is silent that Petitioner's counsel, and the court, knew exactly what medications Petitioner was taking to control his mental illnesses or how these medications may have affected his ability to stand trial and to assist in his defense. Further, not only did Petitioner's counsel not present anything to the Court to suggest that Petitioner was taking psychotropic medications, but the evidence available to Petitioner's counsel and the court prior, during, and after Petitioner's trial shows that Petitioner displayed behavior consistent with being competent to stand trial and to assist in his defense.  Moreover, Petitioner has failed to show that, even if his

08cv0548

counsel's representation fell below an objective standard of reasonableness (which the court has found not to be the case), he was prejudiced by his counsel's performance.

As a result, the Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

## 2. Failure to Inform Petitioner of Potential Life Sentence

Petitioner contends that his counsel did not advise him that he was facing a potential sentence of life imprisonment. Respondent argues that Petitioner was fully advised of his potential sentence.

Similar to Petitioner's claim that he suffered ineffective assistance of counsel for his counsel's failure to raise his competence, (see Section VIII.1. of this Report and Recommendation), Petitioner presented this claim to the California Supreme Court. The California Supreme Court denied the claim on the merits without comment or citation.  Therefore, a federal court independently reviews the record to determine of the state court decision is objectively reasonable. Himes, 336 F.3d at 853.

Here, Petitioner fails to point to anything in the record which could lead this Court to conclude that his counsel did not advise him of the potential life sentence he faced.  In fact, the record reflects that the contrary appears to be true.

The Information filed against Petitioner stated that Petitioner was subject to California's Three Strikes Law. (Respondent's Lodgment No. at 1-3).  It is reasonable to infer that Petitioner's counsel discussed the Information with Petitioner.

During Petitioner's trial, when the court was discussing an ill juror, the court stated:

> This trial, although it's a single count, is important to (Petitioner). Because of his prior record, he's got

1    a lot of time resting on this jury's verdict.  The
     jury has been out considering his case for a day and
2    a half on a single count, and I don't want to jeopar-
     dize the work that this jury has done.
3    (Respondent's Lodgment No. 2 at 502).

4    Petitioner did not make any statements to the court in response to

5    the court's comments regarding his sentence when it would have been

6    appropriate to do so. Therefore, the court infers that had Peti-

7    tioner not known of his potential sentence, he would have sought

8    clarification of the courts comments.  He did not do so.

9          Petitioner's letter to the court, noted in Section VIII.1. of

10   this Report and Recommendation, (Respondent's Lodgment No. 1 at

11   126), affirms that Petitioner was aware he was facing a potential

12   sentence of life imprisonment.  Notably, the letter does not inform

13   the court that Petitioner's counsel did not advise Petitioner that

14   he was facing such a sentence.  If Petitioner insisted on presenting

15   the letter to the court as he did, it is reasonable to infer that he

16   would have mentioned in the letter that his counsel did not advise

17   him of his potential sentence.

18         Consequently, the Court is left with nothing, other than

19   Petitioner's self-serving statements, that his counsel did not

20   advise him of his potential sentence of life imprisonment.  Without

21   more, the Court can not conclude that Petitioner's counsel's

22   performance fell below an objective standard of reasonableness.

23         Additionally, Petitioner has failed to demonstrate that he

24   was prejudiced by his counsel's alleged failure to advise him of his

25   potential sentence.  Petitioner does not state that had he known his

26   potential sentence, he would not have proceeded to trial or that he

27   would have accepted another disposition of his case.

28         As a result, the Court can not find that the California

08cv0548

1   Supreme Court's decision on this claim was unreasonable, nor that

2   Petitioner's counsel was ineffective for his alleged failure to

3   advise Petitioner of his potential sentence.   Further, Petitioner

4   fails to show that he was prejudiced by the alleged failure.   The

5   Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

6   ### 3. Failure to File Petition to Exhaust State Court Remedies

7   Petitioner contends that his appellate counsel was ineffec-

8   tive for his failure to exhaust his state court remedies.   Respon-

9   dent argues that Petitioner's claim is moot.

10   Petitioner does not have the right to be represented by

11   counsel to file a petition to the state's highest court in order to

12   exhaust his state court remedies. Ross v. Moffitt, 417 U.S. 600,

13   610-615 (1974).   Therefore, Petitioner can not support his claim

14   that his appellate counsel's performance fell below an objective

15   standard of reasonableness.

16   Moreover, on August 20, 2009, this Court found that on

17   November 26, 2008, Petitioner filed a Petition for Writ of Habeas

18   Corpus in the California Supreme Court for the purposes of exhaust-

19   ing his state court remedies.   On May 20, 2009, the California

20   Supreme Court denied the Petition.   Therefore, the Court concluded

21   that all of Petitioner's claims were exhausted. (Order filed August

22   20, 2009, Doc. # 29 at 9-10). Therefore, Petitioner can not support

23   his claim that he suffered any prejudice as a result of his

24   appellate counsel's alleged failure.

25   As a result, the Court can not find that the California

26   Supreme Court's decision on this claim was unreasonable, nor that

27   Petitioner's appellate counsel was ineffective for his alleged

28   failure to file a petition to exhaust Petitioner's state court

08cv0548

remedies.  Further, Petitioner fails to show that he was prejudiced by the alleged failure.  The Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

**CONCLUSION AND RECOMMENDATION**

After a review of the record in this matter, the undersigned Magistrate Judge RECOMMENDS that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice.

This report and recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than May 28, 2010, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than June 18, 2010.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 27, 2010

_____
Hon. William V. Gallo
U.S. Magistrate Judge

08cv0548